The facts on which these lawsuits are based arise out of the refusal of the purchasers to complete the purchase of the *Page 1092 
capital stock and assets of Bama Coal Company and the refusal of the Bank of the Southeast to honor a letter of credit that was delivered by the purchasers to the sellers as earnest money. The cases come before this Court on the pleadings, discovery, the trial court's ruling granting the bank's motion to dismiss count four of the sellers' amended complaint and the trial court's favorable ruling on the bank's second motion for summary judgment. The sellers appeal from the final order; they claim the trial court erred in granting the bank's motion to dismiss count four of their amended complaint; they also claim the court erred in granting the bank's second motion for summary judgment.
The facts of the cases are as follows: The sellers entered into an "Agreement of Purchase and Sale" with the purchasers wherein the sellers agreed to sell and the purchasers agreed to purchase the capital stock and assets of Bama Coal Company for the price of $2,000,000. The agreement was entered into on October 24, 1975, with the transaction to take place on or before December 3, 1975.
The Bank of the Southeast issued a letter of credit in the amount of $100,000 for the account of the purchasers. This letter of credit was delivered to the sellers as earnest money under the contract. The "letter of credit" was conditioned on the production by the sellers of numerous documents, identified as "conditions" in the Agreement of Purchase and Sale.
When the purchasers refused to close the deal on December 4, 1975, the sellers made demand on the Bank of the Southeast for payment of the "letter of credit." The bank, however, refused to honor the "letter of credit" on the ground that the sellers had allegedly failed to furnish the bank with all of the documentation required by the Agreement of Purchase and Sale. The sellers filed suit against the bank to recover the $100,000 letter of credit which had been delivered as earnest money. The purchasers were named as third-party defendants.
The sellers subsequently attempted to amend their complaint by adding a count which claimed that the bank had participated in a fraudulent artifice, scheme or device to deprive them of their earnest money because of the bank's refusal to honor the letter of credit. The trial court granted the bank's motion to dismiss count four of the amended complaint on the ground that the amendment did not relate back to the filing of the original complaint, and because it did not relate back, it was barred by the statute of limitations. Ultimately, the trial court rendered a final order on the matter by granting the bank's second motion for summary judgment.
 I
First, we will address the sellers' assertion that the trial court erred in granting the bank's motion to dismiss count four of the sellers' amended complaint.
The sellers assert that count one of their original complaint sought damages for the wrongful dishonor by the bank of their demand for payment under the letter of credit, and that the gravamen of the suit was the act of dishonor; sellers assert that after they ascertained that the wrongful dishonor resulted from the bank's participation in a fraudulent artifice, scheme or device to deprive them of their earnest money, they then sought to amend their original complaint to include an action to recover damages for this fraud. The sellers contend that the amended complaint alleging fraud should "relate back" to the date of the filing of the original complaint under Rule 15 (c), A.R.C.P., because the fraud count allegedly arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading.
Rule 15 (c), A.R.C.P., states:
 "Whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading. . . ." *Page 1093 
In Knox v. Cuna Mutual Insurance Society, 282 Ala. 606, 613,213 So.2d 667 (1968), this Court stated:
 "A new cause of action is not set up by amendment where the same substantial facts are pleaded merely in a different form, so that a recovery on either count of the complaint would bar a recovery on the other. As long as the plaintiff adheres to the contract or the injury originally declared upon, an alteration of the modes in which the defendant has broken the contract or caused the injury is not an introduction of a new cause of action. The test is whether the proposed amendment is a different matter, another subject of controversy, or the same matter more fully or differently laid to meet the possible scope of the testimony. United States Steel Corp. v. McGehee, 262 Ala. 525, 80 So.2d 256; Isbell v. Bray, 256 Ala. 1, 53 So.2d 577; Alabama Consolidated Coal Iron Co. v. Heald, 154 Ala. 580, 45 So. 686."
The "relation back" principle can be refined further by considering the following passage from the case of Bracy v.Sippial Electric Company, Inc., 379 So.2d 582, 583, 584 (Ala. 1980):
 "On this appeal we will deal with the issues between Bracy and Sippial. Bracy first contends that the trial court erred in granting, at the beginning of trial, Sippial's motion to amend, which added a fraud count and which alleged an increased amount of damages. ARCP 15 expressly provides that amendments should be freely allowed when justice so requires; and our rule regarding amendments is that Rule 15 should be liberally construed within the sound discretion of the trial judge. Alabama Farm Bureau Mutual Casualty Insurance Co. v. Guthrie, 338 So.2d 1276 (Ala. 1976). The party opposing the amendment must show that the amendment would cause actual prejudice or undue delay in order to bar an amendment. Miller v. Holder, 292 Ala. 554, 297 So.2d 802 (1974); Poston v. Gaddis, 372 So.2d 1099
(Ala. 1979).
 "Bracy contends that the proposed amendment at the beginning of trial actually prejudiced his case because all discovery had been completed and Bracy therefore had no opportunity to determine the factual basis for the allegation of fraud and had no opportunity to prepare a defense against the same. However, the amendment specifically incorporated detailed facts contained in a prior amended complaint and restated additional facts contained in the same prior amended complaint.
 "The only new facts alleged were that Bracy represented to Sippial that he, Bracy, would make payments to Sippial as the work progressed, as evidenced by the subcontract between the two; that the representations were false; that Bracy knew they were false; that they were made by Bracy intentionally to defraud Sippial; that Sippial believed them; and that Sippial relied on them when it entered into the subcontract.
 "It is obvious from the amendment that Sippial was going to attempt to prove its fraud allegation with facts previously pled and with the terms of the subcontract. The fraud count was merely an additional cause of action. Where an amendment merely changes the legal theory of a case or adds an additional theory, but the new or additional theory is based upon the same set of facts and those facts have been brought to the attention of the other party by a previous pleading, no prejudice is worked upon the other party. United States v. Johnson, 288 F.2d 40
(5th Cir. 1961). Cases interpreting the Federal Rules of Civil Procedure are authority in the construction of the Alabama Rules of Civil Procedure. Assured Investors Life Insurance Co. v. National Union Associates, Inc., 362 So.2d 228 (Ala. 1978). We cannot say that Bracy suffered actual prejudice or that the trial would be unduly delayed by allowing the amendment; the court, therefore, did not abuse its discretion in allowing it. Alabama Farm Bureau Mutual Casualty Insurance Co. v. Guthrie, supra.
Unlike the Bracy v. Sippial, supra, case, any proof of fraud in the case at bar would *Page 1094 
entail proof of facts not remotely suggested in the prior pleadings which dealt with an alleged dishonor of the letter of credit. No allegations of fraud have been mentioned in any of the depositions taken in the case. When the bank faced a suit based only on the contractual nature of the letter of credit, it was only concerned with showing the existence or non-existence of certain documents and agreements which were, in effect, conditions precedent to liability arising out of the letter of credit. Under the fraud count, however, the complexity and scope of the bank's defense would be greatly expanded. Additional discovery may have been required, involving each of the seven sellers, each of the five purchasers, any bank employee or agent which the plaintiffs might assert participated in such a fraudulent scheme and, also, any third party which the plaintiffs might contend was involved in the scheme.
Considering these facts, this case is more appropriately decided under the principle applied in Stead v. Blue Cross-BlueShield of Alabama, 294 Ala. 3, 6, 310 So.2d 469 (1975), wherein this Court stated:
 "Rule 15 and the Committee Comments have been aptly stated in Miller and there is no need to reiterate them in this opinion. We simply state here that if Rule 15 is to be of any benefit to the bench, bar, and the public, the trial judges must be given discretion to allow or refuse amendments. However, we state that amendments are to be freely allowed and refusal of an amendment must be based on a valid ground. We state also that Rule 15 must be liberally construed by the trial judges. But, that liberality does not include a situation where the trial on the issues will be unduly delayed or the opposing party unduly prejudiced.
 "In looking at this case we must weigh the prejudice to the defendant Blue Cross against the possibility that the petitioner will have to go through a second trial. The evidence upon which the defense on the policy would rest consists of the policy itself and its language, medical testimony concerning pre-existing illness. In the case of fraud and misrepresentation, the defendant would have tried to find all the people who processed petitioner's application three years ago, or had anything to do with it.
* * * * * *
 "A reading of that testimony does not indicate any evidence of fraud on the part of the company. In fact, according to the respondent's brief there was no evidence that Stead ever talked to anyone from Blue Cross before he took out the policy. This amendment was offered just before a third setting of trial. All of the fraud facts were available at the time the original complaint was filed or certainly within one year after it was filed. While the trial judge does not give reasons for overruling the motion, these things were no doubt considered in the exercise of his discretion."
We are of the opinion that the learned trial judge did not abuse his discretion in ruling that the bank in this case would have been unduly prejudiced had the sellers been allowed to amend the complaint to include an action for fraud. Hence, it was not error for the trial judge to rule that the amendment did not relate back and was therefore barred by the statute of limitations.
 II
The second issue presented by the appellant arises out of the trial court's ruling wherein it granted the bank's second motion for summary judgment.
At the outset, we note that whenever there is a scintilla of evidence supporting the position and assertions of the non-moving party, then summary judgment is inappropriate. Furthermore, the burden is on the movant to show there is no genuine issue of material fact. In determining whether the movant has sustained the burden, the scintilla rule is applied, and all reasonable inferences from the facts, viewed most favorably to the non-moving party, are indulged. Applying these well established principles of law, we find that *Page 1095 
summary judgment was appropriate under the facts of this case.
Because of the complicated nature of the facts in this case, and because we affirm the trial court's grant of summary judgment, we set out, at length, the opinion and order of the trial judge wherein he granted the bank's motion for summary judgment.
"OPINION AND ORDER GRANTING THE MOTION FOR SUMMARY JUDGMENT FILED BY THE DEFENDANT, BANK OF THE SOUTHEAST AND GRANTING THE MOTION FOR SUMMARY JUDGMENT FILED BY THE THIRD PARTY DEFENDANT
"This case has been submitted for decision by this Court on the Motion for Summary Judgment filed by the defendant, Bank of the Southeast, a corporation (hereafter `Bank'), and the Motion for Summary Judgment filed by the third-party defendants, Earl E. Jackson, III, Charles C. Nicrosi, William K. Nicrosi, Alton B. Parker and Richard R. Patterson, Jr. (hereafter `Purchasers').
"The plaintiffs in this case, Ray Graham, T.C. Evans, Paul Ray, Dewell Emerson, Dennis Mills, Jr., and Douglas Tittle (hereafter `Sellers'), make claim against the Bank under an irrevocable commercial letter of credit issued by the Bank on October 24, 1975, at the request of the Purchasers and engaging to honor drafts in the aggregate amount of $100,000 conditioned upon the presentation of certain documents described in the letter of credit as follows:
 "`Documentation that the Agreement of Purchase and the Sale dated October 24, 1975 has been consummated which documentation shall be presented on or before December 10, 1975; or a sworn affidavit from Sellers stating that they have complied with all covenants and terms of the Agreement of Purchase and Sale dated October 24, 1975 and documentation that Sellers have complied with all the terms and covenants of said Agreement of Purchase and Sale which documentation shall be presented after the date set for closing therein but not later than December 10, 1975.'
"The letter of credit was presented to the Bank for payment on December 4, 1975 accompanied by an affidavit executed by the Sellers and certain documents purporting to meet the requirements of the letter of credit. Following the refusal of the Bank to honor the drafts accompanying the letter of credit, the Sellers filed this lawsuit.
"In support of its Motion for Summary Judgment, the Bank argues that under the undisputed evidence presented, the Sellers failed to provide the documentation required by the letter of credit and that the Bank was therefore under no obligation to the Sellers under the letter of credit.
"The issue presented on the Bank's Motion for Summary Judgment then is whether the Sellers complied with the requirements of the letter of credit in presenting documentation to the Bank. The Bank's obligation is stated under Section 7-5-109 (2), Ala. Code 1975, as follows:
 "`An issuer must examine documents with care so as to ascertain that on their face they appear to comply with the terms of the credit but unless otherwise agreed assumes no liability or responsibility for the genuineness, falsification or effect of any document which appears on such examination to be regular on its face.'
"The Agreement of Purchase and Sale dated October 24, 1975, referred to in the letter of credit, provides for the sale by the Sellers of all of their capital stock in Bama Coal Company, Inc., and all of their interest as partners of a partnership known as National Leasing Company in certain coal mining leases to the Purchasers.
"Under paragraph 2 of the Agreement, the purchase price for the purchase of such assets was $2,000,000, with $100,000 to be paid as earnest money represented by the Bank's irrevocable letter of credit; an additional amount of $500,000 in cash to be paid on the date of closing; and the remainder of the purchase price in the amount of $1,400,000 to be paid by the assumption of *Page 1096 
certain liabilities of the Sellers in the approximate amount of $400,000 with the sum of $1,000,000 to be evidenced by a promissory note bearing interest at the rate of 8% per annum and payable over a period of 4 years from the date of closing.
"Paragraph 3 of the Agreement provided that the purchase and sale was conditioned on the fulfillment of a number of terms and conditions including that set forth in 3 (e) as follows:
 "`Sales contracts shall be procured on or before the date of closing for the sale of coal of not less than 15,000 tons per month at a purchase price of not less than $20.00 per ton and for a period of not less than six months; any contracts of sale now held or hereafter acquired by the Sellers shall be herein included. Purchasers shall have the right to negotiate the above said contract within three (3) weeks from the date of the signing of this Agreement of Purchase and Sale. If, within said three (3) weeks, Purchasers have been unable to procure said contract, either Sellers or Purchasers shall have the right to procure said contract prior to closing. Purchasers shall have the right to refuse any contract offered by the Sellers, however, refusal by the Purchaser to accept a contract meeting the specifications of this paragraph shall relieve the Sellers of the obligation of performing this portion to the extent of the contract offered by the Sellers. If purchaser of said coal contract does not have the substance to honor said contract then Sellers shall not be relieved of said obligation.'
"At the time the letter of credit was presented to the Bank for payment, the Sellers also presented a number of documents to the Bank including an affidavit executed by all of them in which they stated that they had complied with all of the requirements, obligations and provisions of the Agreement of Sale. However, the evidence presented by the Bank in support of its Motion for Summary Judgment indicates that the Sellers had not then procured sales contracts for the sale of not less than 15,000 tons of coal per month at a purchase price of not less than $20 per ton for a period of not less than 6 months. The Bank has referred specifically to the testimony of Ray Graham on oral deposition taken on October 10, 1980 when Graham testified as follows concerning the coal sales contract required under Paragraph 3 (e) of the Agreement, commencing at page 15 of his deposition:
 "`Q. When you were in Mr. Wilhelm's office on December 4, did you provide Mr. Wilhelm with a coal sales contract as required by part 3 (e) of the Purchase and Sales Agreement?
"`A. We did not have a sales contract, no.
 "`Q. Did you ever attempt to procure a sales contract as required by Part 3 (e) of the Purchase and Sales Agreement?
"`A. I made some negotiations for a contract.
"`Q. Did you ever get this contract?
 "`A. Didn't — no, I never got it, I didn't choose to get it, because Mr. Patterson and Mr. Parker said they didn't want it, they had one much better than what I could get.'
"Graham did produce a letter dated November 2, 1977 signed by Eleanor G. Terry, Graham's sister, purporting to be acting as the buyer for Champion Papers, in which Ms. Terry stated:
 "`This letter is to verify that Bama Coal Company did offer to sell Champion 15,000 tons of coal per month for six months at $20 per ton, F.O.B. delivered, 8% ash, 1.25 sulphur or less, 12,000 B.T.U.'s.'
"However, Graham admitted in his testimony that he had no written document which indicated that he had a sales contract meeting the requirements of paragraph 3 (f) (sic) of the Agreement on December 4, 1975, when the letter of credit was presented for payment.
"The Bank also maintains that the Sellers failed to present documentary evidence indicating that they had complied with the provisions of paragraph 3 (f) of the Agreement. Paragraph 3 (f) provides as follows: *Page 1097 
 "`Sellers shall have procured a new lease to be executed by and between Iris S. O'Rear, Patricia O'Rear Robertson and her husband, John M. Robertson, Emma O'Rear Foy and her husband, James E. Foy, acting by and through their agent and attorney-in-fact, Caine O'Rear, Jr., and also to be executed by Caine O'Rear, Jr., individually, and his wife, Kathryn I. O'Rear, as lessors, and Bama Coal Company, Inc., as lessee, leasing the tipple, railroad siding and coal yard situated in the following described land, to-wit:
 "`The S 1/2 of NE 1/4; the N 1/2 of SE 1/4; and the SE 1/4 of SE 1/4; all in Section 10, Township 12 South, Range 12 West, Marion County, Alabama, for a period of 5 years from the date thereof, with a 5-year renewal option, which shall be renewable at the option of Bama Coal Company, Inc., at a lease rate not to exceed an average of $3,000 per year.'
"At the time that he testified on deposition on October 10, 1980, Ray Graham identified 2 of the leases executed by Iris O'Rear and others with Bama Coal Company as lessee. One such lease dated November 11, 1975, described the following property:
 "`All that part of the SE 1/4 of the SE 1/4, Section 10, Township 12, Range 12 which lies north of the public highway.'
"The second lease executed December 2, 1975, described the following property:
 "`The NE 1/4 of the SE 1/4, Section 10, Township 12, Range 12. Surface only.'
"As the Bank has argued, the description in the two leases produced by the Sellers to the Bank did not include the S 1/2 of the NE 1/4 and the NW 1/4 of the SE 1/4 of Section 10, Township 12, Range 12 although these last described parcels were included in the description of the real estate to be leased described in paragraph 3 (f) of the Agreement.
"However, it appears that the primary intent of the parties in paragraph 3 (f) was for Bama Coal Company to lease the tipple, railroad siding and coal yard situated on the property. It is conceivable that the tipple; railroad siding and coal yard are actually situated on the 80 acres described in the two leases produced by Ray Graham. In that event, the Sellers would have been in substantial compliance with the provisions of 3 (f) respecting the property to be leased.
"The difficulty is that the Bank would not be able to know from looking at the leases whether or not they were in compliance with the paragraph 3 (f) respecting the property. This difficulty could have been resolved by a survey or affidavit from the lessors stating that the tipple, railroad siding and coal yard were located on the property described in the leases.
"Paragraph 3 (f) of the Agreement also requires that the rental not exceed an average of $3,000 per year both for the initial five-year term as well as the five year renewal term.
"The lease covering the SE 1/4 of the SE 1/4 provided as follows with respect to the rental:
 "`3. This lease is for a period of five (5) years from its date and for consideration LESSEE shall pay a monthly rental of Two Hundred and No/100 ($200.00) DOLLARS each month in advance. . . .
 "`4. Lessee shall have a right to extend the initial period of this lease for an additional term of five (5) years at a monthly rental of THREE HUNDRED AND NO/100 ($300.00) DOLLARS. . . .'
"The lease conveying surface rights only to the NE 1/4 of the SE 1/4 of the same section contained the following provisions with respect to the rental.
 "`3. This lease is for a period of five (5) years from November 11, 1975, and for consideration LESSEE shall pay a monthly rental of ONE HUNDRED AND NO/100 ($100.00) DOLLARS each month in advance . . . Provided, however, that there shall be no monthly payments due for the period from November 11, 1975 until May 11, 1976, at which time the monthly payments shall commence.
 "`4. Lessee shall have a right to extend the initial period of this lease for an additional term of five (5) years at a monthly rental of ONE HUNDRED *Page 1098 
FIFTY AND NO/100 ($150.00) DOLLARS . . .'
"Even allowing for the fact that the Lessee was not required to make any payments under one lease for the first six months, the average yearly rental required under both leases during the initial five-year term was $3,480 and in excess of the $3,000 maximum amount provided under paragraph 3 (f). During the five-year renewal term, the average yearly rental required under both leases was $5,400.00. This amount is substantially in excess of the $3,000 maximum required by paragraph 3 (f).
"The evidence presented by the Bank shows that the Sellers did not provide the documentation required by the letter of credit establishing that the Sellers had complied with all the terms and covenants of the Agreement of Purchase and Sale at the time the letter of credit was presented.
"Sellers have submitted an affidavit executed by Ray Graham in which he refers to Paragraph 3 (e) of the Agreement stating:
 "`The language of this section provides certain alternatives. It does not require documentary production. The affidavit of compliance fulfills the requirements of this section.'
"It is true that Section 3 (e) does provide alternatives, but none of the alternatives excuse the initial requirement that a contract be procured providing for the sale of not less than 15,000 tons of coal per month at a purchase price of not less than $20.00 per ton and for a period of not less than 6 months. The coal sales contract contemplated by the Agreement would, if performed, have produced total revenues of not less than $1.8 million.
"The Sellers were relieved of their obligation under paragraph 3 (e) only if the Purchasers refused to accept a coal sales contract meeting the requirements of Paragraph 3 (e) after the same had been presented by the Sellers.
"Since Sellers have admitted that they never negotiated or presented to the Purchasers a coal sales contract meeting the requirements of Paragraph 3 (e), the Sellers cannot now be heard to argue that the Purchasers refused to accept such a contract.
"Furthermore, it is too obvious for argument that the requirement in the letter of credit that documentation be provided the Bank to show compliance with its terms contemplates the presentation of documents specifically described in the letter or evidence of their existence rather than an affidavit stating generally that the Sellers have complied with its terms.
"The letter of credit itself states that the sight drafts must be accompanied by `a sworn affidavit from sellers stating that they have complied with all the covenants and terms of the Agreement of Purchase and Sale dated October 24, 1975, anddocumentation that Sellers have complied with all the terms andcovenants of said Agreement of Purchase and Sale. . . .'
"In the Uniform Commercial Code Practice Handbook, Harfield, Letters of Credit (2nd Ed. 1980) p. 36, the author refers to general principles governing acceptance of letters of credit as follows:
 "`The controlling rule is that the letter of credit must be strictly construed and performed precisely in accordance with its terms * * *
 "` . . . a host of judges have echoed the statement in Equitable Trust Co. v. Dawson Partners[1] that "there is no room for documents which are almost the same, or which will do just as well.'"
"In American Bank Trust Co. v. Banco Nacional De Nicaragua,231 Ala. 614, 166 So. 8 (1936), the Supreme Court of Alabama stated:
 "`It seems to be well settled that a party, who is entitled to draw against a letter of credit, must strictly observe the terms and conditions under which the credit is to become available, and if he does not, and the bank refuses to honor his draft, he has no cause of action against the bank.'
"In Dulien Steel Products, Inc. of Washington v. BankersTrust Co., 189 F. Supp. 922 *Page 1099 
(S.D.N.Y. 1960), the opinion of the United States District Court for the Southern District of New York stated:
 "`When a bank confirms a letter of credit the letter evidences its irrevocable obligation to honor the drafts presented by the beneficiary upon compliance with the terms of the credit. The letter is quite independent of the primary agreement between the party for whose account it is issued and the beneficiary, or any underlying transactions. Neither the issuing nor the confirming bank has any obligation, and is not permitted, to go behind the terms of the letter and the documents which are required to be presented, and to enter controversies between the beneficiary and the party for whose account the letter was opened concerning any other agreements or transactions. . . .'
"Also see Continental National Bank v. National City Bank ofNew York, 69 F.2d 312 (9th Cir. 1934); Venizelos, S.A. v.Chase-Manhattan Bank, 425 F.2d 461 (2nd Cir. 1970); MarineMidland Grace Trust Co. of New York v. Banco Del Pais S.A.,261 F. Supp. 884 (S.D.N.Y. 1966).
"In opposition to the motion filed by the Bank for Summary Judgment, the Sellers state that they presented an affidavit to the Bank stating that they had complied with all of the terms and conditions of the Agreement of Purchase and Sale.
"It is clear, however, that the Sellers had not produced for the Bank's examination, evidence concerning the coal sales contract required by Paragraph 3 (e) of the Purchase and Sales Agreement nor had the Sellers produced documentary evidence that they had leased from the O'Rear family the tipple, railroad siding and coal yard at an average yearly rental of $3,000 for a term of five years with a right of renewal for an additional five-year term.
"While Ray Graham in his testimony on oral deposition attempted to excuse his failure to produce evidence of the coal sales contract by stating that the purchasers had told him that they didn't want it because they had one much better, this could not relieve the Sellers of their obligation to produce evidence of such contract to the Bank.
"The requirements imposed on the Sellers under the letter of credit could not be amended without the consent of the Bank. Article 3 (c) of the Uniform Custom and Practices for Documentary Credits provides that `such undertakings can neither be amended nor cancelled without the agreement of all parties thereto. Partial acceptance of amendments is not effective without the agreement of all parties thereto.'
"While it may be argued by the Sellers that the Bank waived the necessity of presenting a draft by its refusal to pay and also waived any requirement concerning the standing of the Sellers under the letter of credit by not objecting to their standing at the time the Bank refused to pay the same, the Bank did not waive the requirement in the letter of credit that the Sellers produce documentation that they had complied with all of the terms and covenants of the Agreement of Purchase and Sale.
"The Sellers' attorney, Jerry Guyton, testified on oral deposition on July 14, 1977, page 12, in referring to the statements made to him on presentation of the letter of credit by Wilhelm, the President of the Bank as follows:
 "`He says, "that they would not agree, that we had not complied, because, 1, there was no sales contract as required by the Agreement, 2, the equipment was not in good working order, 3, the lease on the 60 acres of mineral was not that which they wanted, and 4, that the coal specifications were different as indicated by the analysis." . . .'
"It is clear from the undisputed evidence that the Sellers had failed to comply with the requirements of the letter of credit issued by the Bank and that the Bank was justified in refusing to pay when the letter of credit was presented.
"In accordance with the foregoing opinion, the Motion for Summary Judgment filed by the Bank of the Southeast is granted. Judgment is hereby rendered in favor *Page 1100 
of the Bank of the Southeast and against the plaintiffs.
"Since the Bank of the Southeast only made claim against the third-party defendants in the event it should be held liable, the Motion for Summary Judgment filed by the third-party defendants is granted and judgment is hereby rendered in favor of the third-party defendants and against the third-party plaintiff, Bank of the Southeast. All costs of Court incurred with respect to the complaint are taxed against the plaintiffs. All costs of Court incurred in connection with the filing of the third-party complaint are taxed against the third-party plaintiff, Bank of the Southeast.
"DONE AND ORDERED this 13th day of August, 1981.
 "/S/ Marvin Cherner
Circuit Judge"
Upon a first reading of the trial judge's order, it might appear that he made findings of fact on disputed issues, but we note that in this case, due to its nature, summary judgment was appropriate because of the principles of law uniquely applicable to letters of credit. The letter of credit sued on required certain documentation to be presented before the bank would be required to honor it. Furthermore, the letter of credit was very specific about which and what type of documentation was necessary. The trial judge determined that the required documentation was not presented by the sellers, and applying principles of law applicable to liability for refusing to honor a letter of credit he held that the defendant bank was entitled to summary judgment, as a matter of law. We hold he did not err.
The judgment of the trial court which dismissed count four of the plaintiff-sellers' amended complaint and the order granting the defendant-bank's second motion for summary judgment are due to be affirmed.
AFFIRMED.
TORBERT, C.J., and JONES, BEATTY and ADAMS, JJ., concur.
[1] (1927) 27 Lloyd's List L.R. 49.