This appeal arises out of a suit seeking reimbursement for payment made on a letter of credit. A jury determined that the plaintiff (issuer) was not entitled to reimbursement, and assessed damages against it for losses the defendants (account customers) allegedly suffered as a result of the issuer's payment to the beneficiary under the terms of the letter of credit. The issuer's motion for a judgment notwithstanding the verdict or a new trial was denied, and this appeal followed. We reverse and remand with instructions.
On May 23, 1984, Joseph and Sally McCarron leased property known as the Gulf Gate Lodge to Peter Blalock, Frank Martin, and Clark Harris. (Some documents in the record indicate that the lease was signed on May 21.) The lease provided for an initial term of three years, with an option to renew, and rent for the entire term was $180,000, payable in monthly installments *Page 1060 
of $5,000 each. In the lease, the lessees agreed to provide an irrevocable letter of credit in the sum of $30,000 for a minimum term of 38 months; the letter of credit was to provide that if a monthly rent installment was more than 30 days late, or if any other term or condition of the lease was breached by the lessees, the lessors could declare the lease null and void and draw on the letter of credit. Finally, the lease provided that if the lessees violated any of the terms, conditions, or covenants of the lease, the lessors would have the right to terminate the lease, and that, upon their doing so, the letter of credit would become immediately due and payable.
On November 2, 1984, Blalock, Martin, and Harris signed an application for a letter of credit with AmSouth Bank, N.A., the plaintiff herein. By signing the application, Blalock, Martin, and Harris indicated that they agreed to be bound by the terms of the security agreement printed on the application. One of the terms provided that the applicants would reimburse AmSouth for any amount it paid on a sight draft, plus interest and expenses incurred. On November 19, 1984, AmSouth issued the letter of credit to Joe McCarron. Because the details of the letter of credit are important to the resolution of this case, the provisions of the letter of credit are set out below:
"Joe McCarron of Gulf Gate Lodge
"PO Box 483
"Orange Beach, AL 36561
"Irrevocable Letter of Credit # 10918
"Expiration: November 19, 1985
"Amount: $30,000.00
"Mr. McCarron:
 "We hereby authorize you to draw on AmSouth Bank, N.A. for the account of Frank Martin, Peter Blalock and ClarkHarris, PO Box 2989, Gulf Shores, AL36542, up to the aggregate amount of * * * $30,000.00 * * * THIRTY THOUSAND AND NO/100 DOLLARS * * * available by your draft at sight accompanied by the following documents:
"1. The original of this Letter of Credit.
 "2. Statement signed by you (Joe McCarron of Gulf Gate Lodge) stating 'I hereby certify that monies are due on the lease on the Gulf State Lodge, with the said lease being dated the 21st day of May, 1984.'
"Partial drawings are permitted.
 "This Letter of Credit will expire at 2:00 p.m., November 18, 1985.
 "All drafts must be marked: DRAWN UNDER AMSOUTH BANK, N.A. LETTER OF CREDIT # 10910. Such a draft must be accompanied by the documents described in No. 1 and No. 2 above and your signed statement reading 'I hereby certify that the amount drawn represents unpaid lease payments on the lease between Joe McCarron of Gulf Gate Lodge and Frank Martin, Peter Blalock and Clark Harris.'
 "We hereby engage with bona fide holders that drafts drawn under and in compliance with the terms of this Letter of Credit that the same shall be duly honored upon presentation.
 "Except as otherwise expressly stated herein, this credit is subject to the Customs and Practice for Documentary Credits (1974 Revision), the International Chamber of Commerce Publication No. 290, and any subsequent revisions thereof approved by a Congress of the International Chamber of Commerce and adhered to by AmSouth Bank, N.A."
The letter of credit was assigned two different numbers and two different expiration dates. On November 24, 1984, Blalock, Martin, and Harris assigned to AmSouth all their rights as lessees under their lease with the McCarrons. AmSouth apparently required this assignment before it agreed to issue the letter of credit in favor of McCarron. The terms of the assignment provided that the lessees would perform all of the duties set forth in the lease and would indemnify AmSouth for any liability arising from the lease.
On November 15, 1985, the McCarrons delivered to the lessees a letter that purported to terminate the lease of Gulf Gate Lodge as a result of the lessees' failure to provide a letter of credit that complied with *Page 1061 
the terms set out in the lease, and, particularly, one that extended for a term of at least 38 months. In the letter, the McCarrons further stated that all remaining lease payments were declared accelerated and due to be paid immediately. The lessees did not pay the amounts declared due at that time.
On November 18, 1985, Joseph McCarron asked his attorney, Sam McKerall, to draft the documents he needed to present to AmSouth to draw on the letter of credit. McKerall prepared three sight drafts for $30,000, payable to McCarron; one draft referred to letter of credit #10910, one draft referred to letter of credit #10918, and one referred to letter of credit #10910 and/or #10918. McKerall also prepared the statement set out below for McCarron's signature:
"SIGNED STATEMENT
"BY JOE McCARRON OF GULF GATE LODGE
"REQUIRED BY AMSOUTH BANK, N.A.
"LETTER OF CREDIT # 10918
"AND/OR LETTER OF CREDIT # 10910
 "With respect to my draft today on the above referenced letter of credit, and the sight draft in the amount of $30,000.00 submitted therewith:
 " 'I hereby certify that monies are due on the lease on the Gulf Gate Lodge, with the said lease being dated the 21st day of May, 1984.'
 " 'I hereby certify that the amount drawn represents unpaid lease payments on the lease between Joe McCarron of Gulf Gate Lodge and Frank Martin, Peter Blalock and Clark Harris.'
 "This the 18th day of November, 1985. "/s/ Joe McCarron"
Finally, McKerall prepared a cover letter for McCarron to deliver to AmSouth, listing the documents that were being presented, and explaining that he referred to two different expiration dates and two different letter of credit numbers in the documents because the original letter of credit drafted by AmSouth referred to the different expiration dates and numbers. The cover letter contained an acknowledgement of receipt, and spaces were provided for the time of receipt and the bank officer's signature.
McCarron presented to AmSouth the draft and the documents McKerall had prepared. AmSouth paid McCarron $30,000 in the form of a cashier's check dated November 25, 1985. The cashier's check referred to letter of credit number "10918(10)." AmSouth apparently was unable to obtain reimbursement from any of the lessees for the monies it paid to McCarron.
On September 2, 1986, AmSouth filed suit against Martin and Harris. Blalock was not named as a defendant. AmSouth alleged that it had paid $30,000 in accordance with the terms of the agreement, and that the defendants had refused to reimburse AmSouth and were in violation of their agreement. AmSouth demanded a judgment in the amount of $30,000, plus interest and attorney fees. The defendants counterclaimed, alleging that AmSouth had negligently or wantonly paid McCarron when it knew or should have known that the conditions of the letter of credit had not been satisfied and that the sum was not due to be paid. They further alleged that as a proximate result of AmSouth's actions, their livelihoods were destroyed, that their credit and reputation in the community were impaired, and that they suffered mental anguish. Each defendant sought $3.5 million in compensatory and punitive damages.
The case was tried before a jury. McCarron testified that on November 18, 1985, the earlier of the two expiration dates listed in the letter of credit, he took the documents needed to draw on the letter of credit to AmSouth in the morning, immediately after he left McKerall's office, and arrived at the bank approximately when it opened. He acknowledged that no one from AmSouth signed the form indicating when the documents were received. McKerall testified that he prepared the documents after McCarron arrived at his office *Page 1062 
at approximately 7:00 a.m., and that the documents were presented to AmSouth before 2:00 p.m. on November 18.
Blalock, Harris, and Martin testified that after McCarron delivered the November 15 letter terminating the lease, each of them told representatives of AmSouth that McCarron's allegations of default were not true and instructed AmSouth not to pay on the letter of credit. The lessees also testified that they lost substantial sums of money after the Gulf Gate Lodge closed and that the losses occurred as a result of the events detailed above.
AmSouth moved for summary judgment, which was denied, and then at trial moved for a directed verdict after all of the evidence was presented. The trial court also denied the directed verdict. The case was submitted to the jury in a bifurcated manner. In the first stage, the jury was presented with two interrogatories:
 "QUESTION: Were the documents submitted by McCarron when compared to the requirements as set out in the letter of credit sufficient to cover each of the requirements contained in the letter of credit?
 "QUESTION: Were the documents presented to the Bank on or before 2:00 o'clock p.m. on the 18th day of November, 1985?"
After deliberating, the jury answered each of the interrogatories "No," and the cause continued into the second stage. During the second stage of deliberations, the jury was instructed to determine whether the lease assignment placed a greater duty on AmSouth than AmSouth had under the letter of credit, and, if so, whether the bank met the duty. The court charged the jury that if it determined that AmSouth did not act reasonably in paying the letter of credit, it should return a verdict for the defendants and assess damages. The jury returned verdicts in favor of defendants Harris and Martin and assessed compensatory damages for each defendant in the amount of $45,000. AmSouth's motion for JNOV or a new trial was denied, and this appeal followed.
AmSouth's primary argument is that the trial court erred in denying its motions for a directed verdict or JNOV because, it argues, the issues should have been decided in its favor as a matter of law. The standard of review applicable to a motion for a JNOV is the same standard initially used by a trial court in determining whether to grant or deny a motion for a directed verdict. Alpine Bay Resorts, Inc. v. Wyatt, 539 So.2d 160 (Ala. 1988). A JNOV motion is properly granted only when there is an absence of proof on a material issue or when there are no controverted questions of fact on which reasonable people could differ and the moving party is entitled to a judgment as a matter of law. Id. AmSouth contends that the trial court should not have submitted the interrogatories to the jury because, it argues, neither of the issues presented controverted questions of fact.
 I.
First, AmSouth argues that the documents McCarron presented in order to draw on the letter of credit were entirely consistent with the terms set out in the letter of credit; and that the only ambiguities or inconsistencies existedwithin the letter of credit, not between the letter of credit and the documents McCarron provided. Accordingly, AmSouth argues that it was obligated to pay McCarron on the sight draft.
Letters of credit are used to facilitate commercial transactions by providing the credit of a third party, usually a bank, as an independent guarantee of payment to protect the parties. The certainty of payment is the most important aspect of a letter of credit transaction, and this certainty encourages hesitant parties to enter into transactions, by providing them with a secure source of credit. Leon,Letters of Credit: A Primer, 45 Md.L.Rev. 432 (1986). In a basic transaction, a buyer and a seller enter into a contract for goods. In that agreement, the buyer promises to establish a letter of credit with a bank in the amount of the purchase price. Upon the buyer's application, the bank issues a letter of credit in favor of the seller, promising to *Page 1063 
pay the seller when he presents a draft and any documents specified in the letter. When the seller presents the appropriate documents, the bank pays the seller and seeks reimbursement from the buyer, who then takes the documents and retrieves the goods. In this context, the buyer is the "customer," the seller is the "beneficiary," and the bank is the "issuer."
Letter of credit transactions are often governed by statute, and in Alabama a letter of credit is statutorily defined as an engagement by an issuing bank, made at a customer's request, that the issuer will honor drafts or other demands for payment upon compliance by the beneficiary of the credit with the terms specified in the letter of credit. Ala. Code 1975, §7-5-103(1)(a). Thus, there are two distinct sets of obligations involved in a letter of credit transaction: the agreement between the issuer and the beneficiary is the letter of credit itself, and the agreement between the customer and the beneficiary that calls for the letter of credit is the underlying contract for the goods or services. This Court has stated that the underlying contract between the customer and the beneficiary of the credit is independent of the rights and obligations created by the letter of credit. Citronelle UnitOperators Committee v. AmSouth Bank, N.A., 536 So.2d 1387 (Ala. 1988). The issuing bank has no obligation, nor is it permitted, to go behind the terms of the letter and the documents required to be presented, and to enter controversies between the beneficiary and the customer for whom the account was opened.Bank of the Southeast v. Jackson, 413 So.2d 1091 (Ala. 1982).
This is consistent with the rules set out in Uniform Customsand Practice for Documentary Credits ("UCP"), which were specifically adopted in the letter of credit in this case. Article 3 provides:
 "Credits, by their nature, are separate transactions from the sales or other contract(s) on which they may be based and banks are in no way concerned with or bound by such contract(s), even if any reference whatsoever to such contract(s) is included in the credit."
Art. 3, UCP, 1983 Revision, International Chamber of Commerce ("ICC") Pub. No. 400. That document further provides:
"C. Liabilities and responsibilities
"Article 15.
 "Banks must examine all documents with reasonable care to ascertain that they appear on their face to be in accordance with the terms and conditions of the credit. Documents which appear on their face to be inconsistent with one another will be considered as not appearing on their face to be in accordance with the terms and conditions of the credit.
"Article 16.
 "a. If a bank so authorized effects payment, or incurs a deferred payment undertaking, or accepts, or negotiates against documents which appear on their face to be in accordance with terms and conditions of a credit, the party giving such authority shall be bound to reimburse the bank which has effected payment, or incurred a deferred payment undertaking, or has accepted, or negotiated, and to take up the documents.
 "b. If, upon receipt of the documents, the issuing bank considers that they appear on their face not to be in accordance with the terms and conditions of the credit, it must determine, on the basis of the documents alone, whether to take up such documents, or to refuse them and claim that they appear on their face not to be in accordance with the terms and conditions of the credit.
 "c. The issuing bank shall have a reasonable time in which to examine the documents and to determine as above whether to take up or to refuse the documents."
Arts. 15, 16, UCP, 1983 Revision, ICC Pub. No. 400.
Here, the letter of credit authorized McCarron to draw up to $30,000 upon presentation of a sight draft, the original letter of credit, and two statements certifying that the amount drawn represented monies due on the lease of Gulf Gate Lodge. The record establishes without contradiction *Page 1064 
that McCarron provided all of these documents to AmSouth in exactly the manner prescribed in the letter of credit. There are inconsistencies within the letter of credit, in that there are two different expiration dates and two different numbers assigned to the letter of credit. McCarron, however, took these discrepancies into account, referring to both of the numbers assigned to the letter of credit and submitting the documents on November 18, the earlier of the two expiration dates. The only discrepancies here were located within the letter of credit; the documents submitted by McCarron appeared, on their face, to be in exact accordance with the terms and conditions of the letter of credit.
The defendants contend that the documents McCarron submitted were not in compliance with the terms of the letter of credit because, they argue, those documents contained fraudulent assertions of which AmSouth was, or should have been, aware. They argue that McCarron falsely certified that rent payments were due and that AmSouth knew of the falsity because it was an assignee of the lease and because the defendants repeatedly informed AmSouth that they were not in arrears. Therefore, the defendants argue, with knowledge of the fraud in the documents McCarron presented, AmSouth could not recognize those documents as being in compliance with the terms of the letter of credit. These arguments do not constitute a defense to this lawsuit.
The UCP, which governs this dispute, does not refer to a fraud exception to the payment obligations established in a letter of credit. This Court, in other circumstances, has recognized a fraud exception when there is evidence of forgery or fraud in the issuance of the letter or fraud in the underlying transaction for which the letter of credit was issued. See Citronelle Unit Operators Committee. However, a fraud exception has no application here, for several reasons. First, the defendants did not plead or prove the elements of fraud in the trial court. Second, the defendants assert that they were not in arrears when McCarron drew on the letter of credit, but they fail to acknowledge that three days before McCarron submitted the documents to AmSouth, he delivered a letter to the lessees that terminated the lease for failure of the lessees to provide a 38-month letter of credit and that declared all rent payments due. Therefore, at the time McCarron presented the documents, the defendants were in default as to these accelerated payments. Third, Alabama law provides that an issuing bank acting in good faith may honor a draft despite notification from the customer of fraud or forgery not apparent on the face of the documents, but a court may enjoin the bank from honoring the draft. Ala. Code 1975, § 7-5-114(2)(b). As noted above, the documents appeared on their face to comply with the terms of the letter of credit; the lessees' verbal assertions to AmSouth that they were not in arrears did not relieve AmSouth of its obligation to pay the beneficiary, McCarron, according to the terms of the letter of credit. A contrary holding would unjustifiably place AmSouth in the position of determining issues that it had no duty to consider.
In summary, the documents presented by McCarron to AmSouth complied fully with the terms of the letter of credit, and the fraud exception is inapplicable here. The jury's negative answer to the interrogatory addressing this issue is not supported by any evidence.
 II.
AmSouth's second argument is that it is entitled to a judgment in its favor because the only evidence presented at trial clearly established that McCarron submitted the required documents before 2:00 p.m. on November 18. Thus, AmSouth contends, since there was no conflicting evidence about the timeliness of the presentation, the issue should not have been submitted to the jury and there is no support for the jury's determination that the documents were submitted late. The defendants respond by asserting that the timeliness of presentation was a jury issue because no bank officer testified about receiving the documents, because the acknowledgement of receipt on McCarron's letter was not *Page 1065 
completed, and because AmSouth did not pay on the letter of credit until November 25, seven days after McCarron allegedly submitted the documents.
A jury is not free to ignore the undisputed testimony of unimpeached witnesses and substitute its own conclusions for that testimony. Stinson v. Acme Propane Gas Co., 391 So.2d 659,661 (Ala. 1980); Farmers Ginners Cotton Oil Co. v. RelianceIns. Co., 341 So.2d 147, 148 (Ala. 1976). Evidence that is not contradicted by direct testimony or circumstances and that is not inherently improbable or unreasonable cannot be arbitrarily or capriciously disregarded, even though the witness is a party or an interested person. 32A C.J.S. Evidence § 1038 at 728-33 (1964).
McCarron and attorney McKerall, who prepared the documents on the morning of November 18, both stated unequivocally that the documents were presented to AmSouth before 2:00 p.m. on November 18. Their testimony was not impeached or called into question on cross-examination. The evidence is not inherently improbable, incredible, or unreasonable, but the defendants contend that the jury was free to disregard it and to infer that the documents were submitted at some other time, for the reasons cited above. We disagree with the defendants.
First, nothing in the letter of credit or the UCP required AmSouth to sign a written acknowledgment of receipt, and the lack of a signature can not necessarily lead to the inference that the documents were presented late rather than on time or early. Second, the UCP allows AmSouth a "reasonable time" to examine the documents and determine whether to pay on the draft. Art. 16c, UCP, 1983 Revision, ICC Pub. No. 400. The defendants contend that it is nonetheless possible to infer that the documents were presented late, because Alabama's version of the Uniform Commercial Code requires a bank to honor a documentary draft within three banking days. Ala. Code 1975, § 7-5-112(1)(a). Even if the more rigid standard of § 7-5-112
is applied to the facts of this case, it does not permit an inference of untimely presentation by McCarron. That statute indicates that the bank may defer payment if the presenter has expressly or impliedly consented to a deferred payment. Ala. Code 1975, § 7-5-112(1)(b). Because McCarron had the option of consenting to the deferred payment, and obviously did so, no inference of untimeliness arises from AmSouth's payment on November 25.
As noted in Woodward Iron Co. v. Goolsby, 242 Ala. 329,6 So.2d 11 (1942), " 'where the uncontradicted testimony of an unimpeached witness, consistent with the facts actually proven, rebuts a fact resting solely on inference, an inference contrary to this testimony is not permissible.' " (QuotingEquitable Life Assur. Soc. of the United States v. Welch,239 Ala. 453, 195 So. 554 (1940).) Presented only with uncontradicted testimony that AmSouth received the documents on the morning of November 18, the jury was not free to wholly disregard it and to infer instead that the documents were untimely presented.
The jury's verdict on the two special interrogatories is wholly unsubstantiated by the record evidence. Instead, the record establishes that McCarron presented the documents and demanded payment on November 18; that the documents, on their face, complied with the terms of the letter of credit; and that AmSouth was obligated, after a careful review of the documents, to pay on the draft. We therefore hold that the trial court erred as a matter of law in failing to grant AmSouth's motions for directed verdict and JNOV. Accordingly, we reverse the judgment appealed from and remand the cause for entry of a judgment consistent with this opinion.
REVERSED AND REMANDED WITH INSTRUCTIONS.
HORNSBY, C.J., and JONES, HOUSTON and KENNEDY, JJ., concur. *Page 1066