This appeal arises from the trial court's dissolution of a temporary restraining order (TRO) and its denial of a motion by Southern Energy Homes, Inc. ("Southern Energy"), for a preliminary injunction. Southern Energy sought to enjoin AmSouth Bank of Alabama ("AmSouth") from honoring or paying under a standby letter of credit issued by AmSouth. AmSouth issued the letter of credit at Southern Energy's request to secure a bank guarantee in favor of Deutsche Bank, which in turn, issued a performance guarantee in favor of Gesellschaft fur Bauen und Wohnen Hannover ("GBH"), based on a construction contract between Southern Energy and GBH. Southern Energy filed a complaint requesting the Jefferson County Circuit Court to issue a TRO against GBH, AmSouth, and Deutsche Bank.
The trial court initially granted a TRO enjoining AmSouth from honoring any draws on the letter of credit. The trial court modified the TRO to also enjoin GBH and Deutsche Bank from attempting to draw upon the bank guarantee or otherwise collect on the letter of credit. AmSouth, however, moved to modify or dissolve the TRO in *Page 1182 
order to provide certain protections for its international banking business — in an effort to protect itself from irreparable harm and future liability to Southern Energy, GBH, and Deutsche Bank. AmSouth argued that it is not the proper party to be enjoined in this matter, because, it says, unlike traditional letters of credit payable upon presentation of certain documents, the terms of the letter of credit in this case provided for payment upon Deutsche Bank's automatic debit of AmSouth's account. AmSouth asserted that because Deutsche Bank has not been served and has not appeared in this case, it may still seek payment on the letter of credit. Subsequently, the trial court modified the TRO to exclude AmSouth from the original order, so as to provide that AmSouth may honor any demand for payment or pay any debit made by Deutsche Bank on the letter of credit, without violating the TRO. AmSouth asks this Court for the same protections provided for in the trial court's order. This protection is essential, AmSouth asserts, to facilitate an "active foreign banking business."
In June 1995, Southern Energy and GBH entered into a construction contract for the second of two housing projects known as "socialized housing" to be built in Hannover, Germany. In the event of any dispute arising thereunder, the contract provided for German law to govern and provided that the appropriate venue would be Hannover, Germany. The socialized housing contract called for a bank guarantee issued by a European Bank as security for Southern Energy's performance of the contract.[1] GBH wired to Southern Energy 555,117 deutsche marks, representing the first 30% due on the contract, less the 15% value added tax. Deutsche Bank issued the performance guarantee to GBH on the condition that the guarantee would be secured by a standby letter of credit. To facilitate the performance guarantee in favor of GBH, AmSouth issued a letter of credit to Deutsche Bank, for an amount not to exceed 1,276,770 deutsche marks, that related to Southern Energy's performance under the socialized housing contract. The letter of credit served as Deutsche Bank's security for issuing the performance guarantee. The letter of credit authorized Deutsche Bank to draw upon the letter of credit from AmSouth's account upon notification that Deutsche Bank was required by GBH to disburse any amount under the performance guarantee.
The contract between Southern Energy and GBH called for construction of the socialized housing project in accordance with the plans and specifications of GBH's architect. However, GBH changed the design specifications, which increased the overall cost of the project. In January 1996, Southern Energy informed GBH that it would be unable to perform the contract at the agreed price without suffering a substantial financial loss. In February 1996, GBH responded by letter, stating that it would hold Southern Energy in default if Southern Energy failed to complete the project at the agreed time; GBH further stated that, in case of default, GBH reserved the right to make a claim for damages under German law.[2] Nevertheless, GBH extended the deadline for performance from March 1, 1996, to March 15, 1996. GBH began rebidding the socialized housing project to other contractors. Southern Energy submitted another quote on the project, but GBH rejected its offer and awarded the contract to another builder. Southern Energy claims that GBH hired contractors who utilize a different, more expensive means of construction, instead of the prefabricated housing that Southern Energy manufactures. Meanwhile, the date of performance had passed on the initial contract. In June 1996, GBH requested that the advanced installment money on the contract, DM 555,117.39, *Page 1183 
be refunded. Southern Energy complied and transferred the money to GBH's account. Southern Energy asserts that because all of GBH's advanced moneys had been returned, GBH no longer had any basis in fact to demand payment on the bank guarantee, and that Deutsche Bank had no legitimate basis to demand payment on the letter of credit.
Discussions then began between Southern Energy and GBH regarding whether Southern Energy had breached the contract; whether GBH had suffered any damage; and to what extent GBH may have been damaged as a result of the alleged breach. The negotiations continued for about a year, but failed. In March 1997, the parties agreed to open a new letter of credit upon the expiration of the first one in order to secure any damages awards or settlement payments. Without reaching an agreement, however, GBH warned that it would draw on the existing letter of credit. Thereafter, GBH, quoting the terms of the letter of credit itself, decided to "exercise its rights under the performance guarantee" by asserting its right to damages without "prior prosecution" against Southern Energy. The next day, Deutsche Bank presented a draft for payment. After AmSouth informed Southern Energy that it would honor the draft, but before payment had been made, the Jefferson County Circuit Court granted Southern Energy's request for a TRO. As previously noted, the trial court later dissolved the TRO and this appeal followed.
Southern Energy argues that GBH attempted to circumvent the dispute resolution process agreed upon and to collect damages by demanding payment under the performance guarantee. Southern Energy's counsel summed up its complaint against GBH in a letter dated March 26, 1997, as follows:
 "Southern Energy has just informed me of GBH's attempt to draw on the outstanding letter of credit. We have agreed that [SEH] is to provide a new letter of credit to take effect on March 31, 1997, when the existing L/C expires, and GBH has agreed to accept that.
 "The problem is that the underlying obligation to be secured has materially changed. The present letter of credit exists to cover defaults caused by inadequate construction. GBH agrees that SEH completed Duplex H satisfactorily. As to Socialized Housing, GBH chose another contractor. What GBH is seeking is an L/C to cover SEH's liability, if it is found liable, and SEH is willing to post an L/C covering that.
 "SEH considers GBH's attempt to draw on the existing letter of credit to be fraudulent for two reasons: one, SEH did not default on construction and, two, SEH and GBH agreed not to force any issue on the existing L/C, but instead to post a new L/C on March 31. § 5-114 of the Uniform Commercial Code subjects GBH to Alabama jurisdiction of this issue. Please desist and please call me . . ., or else SEH will be forced to seek relief in Court."
Therefore, Southern Energy concludes, because all down payment moneys have been returned to GBH, any attempt to make a demand on the bank guarantee is fraudulent, thereby making Deutsche Bank's imminent demand on the letter of credit fraudulent as well. Southern Energy asserts that GBH's actions fall within the fraud exception of the Uniform Commercial Code ("UCC"). The letter of credit in this case is subject to the Uniform Customs and Practice for Documentary Credits ("UCP"), which has no fraud exception. However, based on the reasoning of Itek Corp.v. First National Bank of Boston, 730 F.2d 19 (1st Cir. 1984), Southern Energy nonetheless asserts that the fraud exception still applies.
GBH argues that the underlying contract between Southern Energy and GBH should not interfere with the purpose and function of the "international letter of credit" issued by AmSouth to Deutsche Bank. AmSouth's obligation to pay under the terms of the letter of credit, GBH argues, is independent of the contractual obligations of Southern Energy; and, GBH argues that, except in extremely rare circumstances, payment on the letter of credit should not be enjoined by any court. GBH argues further that Southern Energy (1) failed to demonstrate a likelihood of success on the merits and (2) failed to demonstrate irreparable injury; i.e., that Southern Energy failed to show that any *Page 1184 
fraud existed in the credit transaction that could preclude payment under the letter of credit. GBH also asserts that it was not a party to the letter of credit transaction; the contract required only that Southern Energy provide a performance guarantee from a European bank. Instead, GBH asserts that Deutsche Bank is the true beneficiary of the credit and that GBH had no role in the actual credit transaction. The underlying engagement in the letter of credit transaction was AmSouth's promise to reimburse Deutsche Bank for any money advanced on the performance guarantee. Thus, GBH argues that to apply the fraud-in-the-transaction exception, Southern Energy must prove that Deutsche Bank, not GBH, committed some type of fraud in the credit transaction.
Section 7-5-114(2), Ala. Code 1975, authorizes courts to issue injunctions that will prevent the issuer in a letter of credit transaction from honoring drafts or demands for payment where there has been a fraud in the issuance of the letter or a fraud in the underlying transaction. Benetton Services Corp. v.Benedot, Inc., 551 So.2d 295 (Ala. 1989). Section 7-5-102(4), however, specifically states that Article 5, including §7-5-114(2), is inapplicable when letters of credit are subject to the UCP. The parties stipulated in the letter of credit that the UCP would govern any dispute that might arise in the credit transaction. This Court has stated:
 "The UCP, which governs this dispute, does not refer to a fraud exception to the payment obligations established in a letter of credit. This Court, in other circumstances, has recognized a fraud exception where there is evidence of forgery or fraud in the issuance of the letter or fraud in the underlying transaction for which the letter of credit was issued."
AmSouth Bank, N.A. v. Martin, 559 So.2d 1058, 1064 (Ala. 1990). In AmSouth v. Martin, however, AmSouth sought reimbursement from the applicant for payments made on a letter of credit. The applicant alleged fraud in the transaction, yet AmSouth still paid on the letter of credit. This Court concluded that the beneficiary had presented documents that complied fully with the letter of credit. Therefore, we held that the fraud exception was inapplicable. Southern Energy argues, however, that AmSouth v. Martin did not limit the fraud exception in all instances. Instead, Southern Energy asserts that it is "clear" that the fraud exception exists as a matter of common law, to be proved by the facts when the UCP governs a dispute. Therefore, Southern Energy asks this Court to extend the fraud exception to cases governed by the UCP.
A letter of credit is a financing engagement by an issuing bank, made at the request of an applicant (or customer), to honor demands for payment by the beneficiary of the credit, provided the terms and conditions of the letter of credit are met. Ala. Code 1975, § 7-5-103(1)(a). Ordinarily, letters of credit promote the sale of commodities by enabling a buyer of goods to obtain financing while at the same time securing payment for those goods in favor of the seller.[3] Katherine A. Barski, Letters of Credit: A Comparison of Article 5 of theUniform Commercial Code and the Uniform Customs and Practicefor Documentary Credits, 41 Loy. L.Rev. 735, 737 n. 7 (1996). Standby letters of credit, in contrast to ordinary commercial credits, are used to guarantee the performance of an obligation. Id. The standby credit substitutes the financial strength of the issuing bank for that of the applicant. John Dolan, The Law of Letter of Credit: Commercial and StandbyCredits ¶ 2.02 (rev. ed. 1996) ("Dolan"). The beneficiary of the standby credit reasonably expects to receive payment from the issuer promptly upon demand and before any litigation between the applicant and the beneficiary may occur. Dolan, at ¶ 3.06 3.07. While the applicant is performing, or preparing to perform, its obligation on the contract, the beneficiary, who awaits that performance, has the benefit of a separate promise (from the issuer) that if the applicant defaults, the issuer will pay the beneficiary an amount of money secured by the letter of credit. Id. at ¶ 3.06. In order to obtain payment from the issuer, the beneficiary *Page 1185 
must notify the issuer, in the manner agreed upon,[4] of its intent to draw upon the credit. Henry D. Gabriel, StandbyLetters of Credit: Does the Risk Outweigh the Benefits?, 1988 Colum. Bus. L.Rev. 705, 708-09 (1988).
A letter-of-credit transaction typically includes three separate commitments: (1) the applicant's agreement with the bank, which obligates the bank to issue the letter and obligates the applicant to reimburse the bank; (2) the bank-beneficiary relationship, i.e., the letter of credit itself; and (3) the applicant-beneficiary relationship, i.e., the underlying contract. See AmSouth v. Martin, 559 So.2d at 1063; Citronelle Unit Operators Committee v. AmSouth Bank,N.A., 536 So.2d 1387 (Ala. 1988) (pointing out the two core obligations involved in a letter-of-credit transaction: the issuer-beneficiary, and the applicantbeneficiary agreement). The letter-of-credit transaction is essentially an independent contract between the issuer (AmSouth) and the beneficiary (Deutsche Bank/GBH). Id., 559 So.2d at 1063; Benetton Services, supra, at 298-99; Citronelle Unit Operators Committee v.AmSouth Bank, N.A., supra. This case involves a four-way security arrangement, adding the bank guarantee transaction between GBH and Deutsche Bank. This four-way security arrangement is typical of many international standby letter-of-credit transactions. See, e.g., Foxboro Co. v.Arabian American Oil Co., 805 F.2d 34 (1st Cir. 1986). In these transactions, the issuer must honor the drafts or other demands for payment upon compliance with the terms of the letter of credit, which exist independently from the underlying transaction. Benetton Services, 551 So.2d at 298-99. Indeed, the UCP provides:
 "a. Credits, by their nature, are separate transactions from the sales or other contract(s) on which they may be based and banks are in no way concerned with or bound by such contract(s), even if any reference whatsoever to such contract(s) is included in the Credit. Consequently, the undertaking of a bank to pay, accept and pay Draft(s) or negotiate and/or to fulfil any other obligation under the Credit, is not subject to claims or defenses by the Applicant resulting from his relationships with the Issuing Bank or the Beneficiary.
 "b. A Beneficiary can in no case avail himself of the contractual relationships existing between the banks or between the Applicant and the Issuing Bank."
Art. 3, UCP, 1993 Revision, International Chamber of Commerce ("ICC") Pub. No. 500.
Parties that enter into a credit arrangement do so to avail themselves of the benefits of that arrangement. Dolan, at ¶ 3.07. Shifting litigation costs is one of the functions of a standby credit. Id. In this situation, the parties negotiate their relationship while bearing in mind that litigation may occur. Id. This cost-shifting function gives one party the benefit of the money in hand pending the outcome of any litigation. Id. It is important to understand the functions of letters of credit in order to fully understand the consequences the fraud exception has on this commercial device. Id. A demand for payment made upon a standby credit usually indicates that something has gone wrong in the contract. Id. at ¶ 1.05[1]. Indeed, this is the nature of the standby letter of credit.Id. In contrast to the commercial credit, nonperformance that triggers payment in a standby credit situation usually indicates some form of financial weakness by the applicant. Id.
For this reason, parties choose this security arrangement over another so that they may have the benefit of prompt payment before any litigation occurs. We recognize that, as a general rule, letters of credit cannot exist without independence from the underlying transaction. Id. at ¶ 2.09[5]. Thus, when courts begin "delving into the underlying contract, they are impeding the swift completion of the credit transaction." Id. "The certainty of payment is the most important aspect of a letter of credit transaction, and this certainty encourages hesitant parties to enter into transactions, by providing *Page 1186 
them with a secure source of credit." AmSouth v. Martin, 559 So.2d at 1062.
The extensive use of the fraud exception may operate to transform the credit transaction into a surety contract. Dolan, at ¶ 3.07. A standby credit is essentially equivalent to a loan made by the issuing bank to the applicant. Id. at ¶ 1.05[1]. Like a surety contract, the standby credit ensures against the applicant's nonperformance of an obligation. Id. Unlike a surety contract, however, the beneficiary of the standby credit may receive its money first, regardless of pending litigation with the applicant. Id. The applicant may then sue the beneficiary for breach of contract or breach of warranty, or may sue in tort, but without the money. Id. Parties to standby credit transactions have bargained for a distinct and less expensive kind of credit transaction. Id. at ¶ 1.05[1], ¶ 3.07[3]. Therefore, we resist the temptation that the fraud exception invites to "transform the quick, efficient payment mechanism of the standby credit into the protracted surety contract inquiry." Id. at ¶ 1.05[1].
In order to succeed on a fraud claim, a party must prove a misrepresentation of material fact, detrimental reliance upon that misrepresentation, and damage occurring as a result of the reliance. Benetton Services, 551 So.2d at 298. Southern Energy did not plead common law fraud. However, Southern Energy asks this Court to incorporate the reasoning of Itek Corp. v. FirstNational Bank of Boston, 730 F.2d 19, when applying the fraud exception in this case. In Itek, the applicant, Itek, entered into a contract with the War Ministry of Iran to supply high technology equipment. Under the contract, the War Ministry paid a percentage as a down payment, with remaining moneys to be paid as the work progressed. The contract required Itek to provide two types of bank guarantees as security. One guarantee secured the War Ministry's down payment; the second was a good-performance guarantee for 10% of the contract price. To secure these guarantees, First National Bank of Boston ("FNBB") issued standby letters of credit in favor of Bank Melli, an Iranian bank. When the United States canceled Itek's export license with Iran in 1979, Itek canceled the contract with the War Ministry, and, according to a force majeure provision in the contract, all bank guarantees of good performance were released. When the War Ministry called on the bank guarantees, Bank Melli then called on the letters of credit. Itek sought and obtained an injunction preventing FNBB from paying on the letters of credit to Bank Melli.
The court in Itek found that to dissolve the injunction would put the money in Bank Melli's hands. The net result would force Itek to sue in Iran in order to recover its money. Given the strained relations between the United States and Iran in 1979,[5]
the court concluded that Itek would be unable to collect its money and that it had no "adequate legal method to recover it." 730 F.2d at 23. The court also concluded that the War Ministry's efforts and, thereby, Bank Melli's efforts, to obtain payment were fraudulent and that they had "no plausible or colorable basis under the contract to call for payment of the letters." Id. at 25. The court issued the injunction, stating that Itek had demonstrated irreparable harm and that any attempt to sue for damages at law would be futile. Id. at 22-23. The Itek court's examination of the underlying contract has drawn criticism, which many believe will hamper the commercial effectiveness of credits. See Dolan ¶ 7.04[c], [e][ii].
In another case from the Court of Appeals for the First Circuit, Foxboro Co. v. Arabian American Oil Co., 805 F.2d 34
(1st Cir. 1986), the court held that an applicant can obtain an injunction only if it has no adequate remedy at law. TheFoxboro case involved a "four-way" security agreement similar to the one in this present case. The applicant, Foxboro, contracted with the beneficiary, the Arabian American Oil Co. ("Aramco") to provide a process control system for a refinery in Saudi Arabia. The contract allowed Aramco to retain a bank guarantee from the Saudi Arabian Bank ("Samba") as security for performance *Page 1187 
and provided that Saudi Arabian law would govern any disputes. To facilitate the transaction, Citibank issued a letter of credit in favor of Samba. A dispute arose between Foxboro and Aramco. Foxboro sought to enjoin the honoring of Aramco's demand on the bank guarantee. The court stated that honoring Aramco's demand on the guarantee and Samba's ultimate demand on the letter of credit would transfer money from Foxboro to Aramco, without altering the merits of the dispute.Id. at 36. The court noted that the contract between Foxboro and Aramco "clearly contemplates" this cost-shifting function, which gives Aramco the advantage of holding the money during any litigation. Id. at 37. That is, the court stated, "an unfair negotiating advantage will not irreparably harm Foxboro." Id. Foxboro's only legally cognizable injury, the court stated, would be that it would have to seek recovery of those sums through the forum contractually agreed upon. Id. at 36. Therefore, the court concluded that where money is at stake and where a plaintiff has an adequate remedy at law, no irreparable harm can result. Id.
The Foxboro court narrowed the scope of the Itek decision, focusing only on whether Foxboro would suffer irreparable injury, and not on the extraneous fraud allegations. In doing so, the court strengthened the fidelity of the independence principle. We agree with the reasoning of Foxboro. Parties engaging in letter-of-credit transactions bargain for the advantages and disadvantages of the credit; they recognize its functions and negotiate its terms. Likewise, "an unfair negotiating advantage will not irreparably harm (Southern Energy]" in this case. Id. at 37. Clearly, a dispute exists between Southern Energy and GBH based on the underlying contract. However, "[f]raud claims should not become surrogates for breach of contract claims." Dolan, ¶ 7.04[4][c]. To invoke the fraud exception in this case would require an inquiry into the underlying contract, further disrupting the important commercial functions of credit law.
A trial court has wide discretion in determining whether to grant or deny injunctive relief under the facts and circumstances of a particular case, and its ruling on that question will not be disturbed except for an abuse of that discretion. Chunchula Energy Corp. v. Ciba-Geigy Corp.,503 So.2d 1211, 1216 (Ala. 1987); Alabama Education Ass'n v. Boardof Trustees of the University of Alabama, 374 So.2d 258 (Ala. 1979); Valley Heating, Cooling Elec. Co. v. Alabama GasCorp., 286 Ala. 79, 237 So.2d 470 (1970). "The trial judge's discretion is a legal or judicial one," subject to review upon violation of well established rules of law or principles of equity. Martin v. First Federal Sav. Loan Ass'n,559 So.2d 1075, 1078 (Ala. 1990); Chunchula Energy, supra. To establish an abuse of that discretion, a party must show that the trial judge committed clear or palpable error that, unless it is corrected, will result in manifest injustice. Martin, supra.
A preliminary injunction can be issued only if the plaintiff shows that injury is both imminent and irreparable and that there is no adequate remedy at law. Benetton Services Corp. v.Benedot, Inc., 551 So.2d 295 (Ala. 1989); Martin, supra. In addition, the plaintiff has the burden to show that there is at least a probability of success on the merits. Alabama EducationAss'n v. Board of Trustees of the University of Alabama, supra;Martin, supra.
In this case, Southern Energy has an adequate remedy at law. Southern Energy agreed in its contract to resolve its disputes with GBH in Germany, subject to German law. Southern Energy has offered no persuasive evidence to indicate that it will suffer irreparable harm. In its contract with GBH, Southern Energy bargained for the benefits of a standby letter of credit; it also bargained for a choice-of-forum provision, which apparently does not preclude subsequent legal action. Arguing that it will suffer irreparable harm without an injunction, Southern Energy provides cursory allegations of procedural hurdles and assertions that policy considerations should prevent an alleged fraud from reaching fruition. "There is nothing in the letter of credit law to suggest that a plaintiff seeking an injunction should not have to satisfy the traditional rules for the extraordinary relief." Dolan, ¶ 7.04[1]; see also Foxboro, supra (holding that where an adequate legal remedy exists there has *Page 1188 
been no irreparable injury). Assuming that GBH had no legitimate basis to draw upon the bank guarantee, Southern Energy could sue in a German court to recover its money for the alleged fraud. Where an adequate legal remedy otherwise exists, Southern Energy will not suffer imminent or irreparable harm.See Benetton Services, supra at 299. Therefore, because Southern Energy did not satisfy the elements necessary for the issuance of injunctive relief, it is unnecessary for us to further address the issue of whether the fraud exception extends to the UCP.
We conclude that the trial court did not abuse its discretion by dissolving the TRO or by denying Southern Energy's motion for a preliminary injunction.
AFFIRMED.
HOOPER, C.J., and MADDOX, SHORES, KENNEDY, and SEE, JJ., concur.
ALMON and COOK, JJ., concur in the result.
[1] The payment schedule reads:
"30% on signing contract (subject to absolute bank guarantee)
"30% on shipping FOB building site in Hannover (subject to absolute bank guarantee)
"20% on completion of the structural shell
"20% after acceptance inspection without defects."
[2] If the contract had not been canceled at this point, Southern Energy would have shipped modules to Hannover, Germany. GBH then would have owed the second 30% installment, which also would have been secured by the bank guarantee. See footnote I (payment schedule). If the modular housing had been defective or nonconforming, GBH could have drawn on the bank guarantee.
[3] In this situation, the buyer would be the customer (or applicant) of the issuing bank, and the seller would be the beneficiary of the letter of credit.
[4] For example, a notice of default.
[5] The court specifically referred to the hostage crisis between the United States and the Islamic Republic of Iran. Presumably, Itek could have requested relief from the Iranian-United States Claims Tribunal. Itek, however, missed the filing deadline for relief in that forum.