Nobel Insurance Company (hereinafter referred to as "Nobel") appeals the summary judgment for The First National Bank of Brundidge (hereinafter referred to as "the Bank"), J.T. Ramage III, Henry T. Strother, Jr., William F. Hamrick, and Palomar Insurance Corporation (hereinafter referred to as "Palomar") (case no. 1001351). The Bank and Ramage appeal to preserve certain claims dismissed by the summary judgment, in the event this Court reverses that judgment (case no. 1001421). The two appeals have been consolidated. We reverse and remand.
Nobel first sued the Bank in the United States District Court for the Middle District of Alabama to enforce certain letters of credit issued by the Bank. The letters of credit were issued by order of the Bank's customers, Strother and Hamrick, both of whom were insurance brokers for Palomar. The letters of credit were signed by Ramage, the Bank's president, and issued in favor of Western American Specialized Transportation Service, Inc. (hereinafter referred to as "Western American"), one of Hamrick's clients who sought insurance coverage from Nobel. The federal district court aptly described the facts underlying this lawsuit in a May 12, 1999, memorandum opinion and order:
 "Nobel insured [Western American] from August 1, 1995[,] through August 1, 1997. The Western American policy had a per claim deductible of $25,000.00 for the policy period from August 1, 1995[,] through August 1, 1996, and a per claim deductible of $10,000.00 for the policy period August 1, 1996[,] through August 1, 1997. Nobel required that `deductible collateral' be held by it in case of non-payment of any deductible amounts, and Western American provided Nobel three [l]etters of [c]redit at the order of [Strother] and [Hamrick]. When the Western American account expired, Western American owed a large sum of money to Nobel for uncollected deductibles. Therefore, in December 1998, Nobel drew upon the [l]etters of [c]redit, but Defendant Bank refused to honor same.
 "Plaintiff Nobel commenced this action (`federal action') on March 9, 1999[,] by filing a two-count [c]omplaint against [the] Bank, wherein [Nobel] alleges that [the] Bank: (1) wrongfully dishonored letters of credit (Count I); and (2) breached its contract with Plaintiff *Page 212 
 Nobel (Count II). On April 6, 1999, [the Bank] filed a Motion to Join Parties, wherein [the Bank] sought to join Strother and Hamrick to the instant action because they are [the] Bank's clients who ordered the issuance of the [l]etters of [c]redit. The court granted said motion by Order entered May 10, 1999. Discovery has yet to commence in this action.
 "On April 9, 1999, Hamrick commenced a declaratory judgment action in the Circuit Court of Montgomery County, Alabama (`state action') against the following defendants: Nobel, Western American, [the] Bank, J.T. Ramage, III, and Strother. Hamrick largely bases the state action on the same facts as in the federal action, yet alleges additional contentions. Nobel insured Western American, and Nobel required Western American to provide [l]etters of [c]redit. Hamrick contends that it was Ramage who `agreed on behalf of [the] Bank to issue the required letter of credit.' (State Compl. ¶ 11.) Further, Hamrick contends that `[i]t was never intended that Hamrick would be liable to the Bank on any letter of credit,' and `Hamrick never signed a note, request, loan agreement, guaranty agreement, or any other document with the Bank relating to the Nobel letter of credit.' (Id. ¶ 12.)
 "Hamrick seeks the following relief in the state action: a declaration that he is not liable to [the] Bank or, if he is liable to [the] Bank, a declaration that Strother, Rammage, and/or Western American are liable to him; a determination of the liability of Western American to Nobel under the 1995 and 1996 policies; and a determination of the liability of [the] Bank to Nobel under the letters of credit. . . ."
(Footnote omitted.)
On October 26, 1999, the federal district court entered a memorandum opinion and order dismissing Nobel's lawsuit without prejudice, and placing the case on the federal district court's administrative docket. The opinion and order stated, in pertinent part, that "the state action contains additional [p]arties and issues necessary for the complete resolution of this case that are not contained in the federal action," and that "this action is completely governed by state law and involves several novel or complex state law issues that the state court is best suited to resolve."
All of the parties filed answers and other responsive pleadings to Hamrick's complaint for a declaratory judgment. The answer filed by the Bank included a counterclaim against Hamrick, crossclaims against Strother, Nobel, and Western American, and a third-party complaint against Palomar. On March 30, 2001, after all parties involved had filed motions for a summary judgment, the trial court entered the following order:
 "This matter is before the Court on the joint motion for summary judgment filed by the defendants [the Bank], [Ramage], [Strother], and [Palomar] dated March 28, 2000, which was joined in by plaintiff [Hamrick] by separate pleading dated April 5, 2000. The only party opposing the joint motion for summary judgment is the defendant and cross-claim plaintiff [Nobel]. Nobel has filed its own motion for summary judgment, dated November 10, 1999, as well as a submission in opposition to the joint motion for summary judgment dated May 12, 2000.
 "This is a declaratory judgment action filed to determine the relative rights and obligations of the parties with respect to certain letters of credit. Briefly stated, Nobel issued two insurance policies to [Western American]. Under the policies, *Page 213 
 Western American was liable to Nobel for the per claim deductible. The insurance agent for this policy was Hamrick, who was employed at that time by Palomar. Nobel was unwilling to issue the policy without `deductible collateral' in the form of letters of credit, and Western American was unable or unwilling to provide such collateral for its deductible obligation. Strother, another Palomar agent, agreed to assist Hamrick in obtaining the required collateral. After meeting with Hamrick and Strother, Ramage, on behalf of the Bank, issued letters of credit to Nobel, with the letters of credit providing that they were issued at the `order' of Hamrick and/or Strother.
 "The joint motion for summary judgment is based on general principles of suretyship law, including Ala. Code § 8-3-13, which, in pertinent part provides:
 "`(a) A surety upon any contract for the payment of money or for the delivery or payment of personal property may require the creditor or anyone having the beneficial interest in the contract, by notice in writing, to bring an action thereon against the principal debtor or against any cosurety to such contract.
 "`(b) If an action is not brought thereon in three months after the receipt of such notice and prosecuted with diligence according to the ordinary course of law, the surety giving such notice is discharged from all liability as surety or his aliquot proportion of the debt, as the case may be.
 "`(c) One surety may give notice in behalf of his cosureties.'
 "The motion also cites the general principle of suretyship law that if the surety is discharged for any reason, the collateral of the surety is also discharged and released. See 74 Am. Jur. 2d Suretyship § 38 and the cases cited therein.
 "The joint motion contends that these legal principles, when applied to the undisputed material facts, bar Nobel's cross-claim under the letters of credit. Specifically, the joint motion asserts that the `contract for the payment of money,' in the words of the statute, is the deductible obligation owed by Western American to Nobel under the insurance policies (Joint Motion, Ex. 1), that the creditor is Nobel, the principal debtor is Western American, that the surety is Strother, and that the collateral for the surety was the letters of credit (Joint Motion, Exs. 2, 3, 4). The notice in writing was the September 30, 1998, memorandum faxed to Nobel by Strother (Joint Motion Ex. 7). It is undisputed that no action was brought by Nobel against Western American within three months, as required by § 8-3-13. Moreover, Nobel does not dispute the receipt or the sufficiency of the notice sent by Strother.
 "Nobel has not shown by affidavit or otherwise that there is a genuine issue concerning these material facts. Nobel's submission simply provides `if the court determines that there is no issue of fact as to the "suretyship" status of Strother and Hamrick' that Noble be allowed `to conduct adequate discovery to further oppose this assertion.' While there is a fact question about whether or not Hamrick was a surety for Western American, there is no fact question about whether Strother is a surety. Indeed, Strother has filed his own affidavit stating, `I met with Ramage and requested that letters of credit be issued by the Bank to Nobel as deductible collateral so that insurance would be issued to Western [American].' The Court sees no reason to delay summary judgment for discovery on whether or not *Page 214 
 Strother is a surety for Western American. Generally, a surety is one who contracts to answer for the debt of another. See, e.g., City of Birmingham v. Trammell, 267 Ala. 245 (1958). Moreover, it is undisputed that the principal debt here is the deductible obligation owed by Western American to Nobel, which is not the debt of Hamrick and Strother, and that the letters of credit state that they were issued on the orders of persons other than Western American. Nobel has not suggested how additional discovery would create a factual issue about Strother's suretyship status.
 "Based on the foregoing, the Court finds that there is no genuine issue as to any material fact and that the moving parties under the joint motion for summary judgment are entitled to judgment in their favor as a matter of law."
On appeal, Noble argues that the trial court erred in entering the summary judgment because, it argues: (1) the trial court improperly applied the law of surety contracts rather than the law applicable to letters of credit; (2) when the trial court entered the summary judgment, discovery relating to Hamrick and Strother's status as sureties was pending; and (3) § 8-3-13, Ala. Code 1975, the surety statute relied upon by the trial court, does not apply to "contracts with collateral conditions."
Our review of a summary judgment is de novo.
 "In reviewing the disposition of a motion for summary judgment, `we utilize the same standard as the trial court in determining whether the evidence before [it] made out a genuine issue of material fact,' Bussey v. John Deere Co., 531 So.2d 860, 862 (Ala. 1988), and whether the movant was `entitled to a judgment as a matter of law.' Wright v. Wright, 654 So.2d 542 (Ala. 1995); Rule 56(c), Ala. R. Civ. P. When the movant makes a prima facie showing that there is no genuine issue of material fact, the burden shifts to the nonmovant to present substantial evidence creating such an issue. Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794, 797-98 (Ala. 1989). Evidence is `substantial' if it is of `such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.' Wright, 654 So.2d at 543 (quoting West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala. 1989)). Our review is further subject to the caveat that this Court must review the record in a light most favorable to the nonmovant and must resolve all reasonable doubts against the movant. Wilma Corp. v. Fleming Foods of Alabama, Inc., 613 So.2d 359 (Ala. 1993); Hanners v. Balfour Guthrie, Inc., 564 So.2d 412, 413 (Ala. 1990)."
Hobson v. American Cast Iron Pipe Co., 690 So.2d 341, 344 (Ala. 1997). Nobel argues that the trial court erred in applying suretyship law to the transaction underlying this lawsuit because, it argues, letters of credit are subject to a separate body of law. Under the law governing letters of credit, Nobel argues, the letters of credit in this case cannot be extinguished by application of § 8-3-13 even though they were arguably posted as collateral by Strother and Hamrick, as sureties, to answer for the debt of Western American.
The letters of credit at issue all state, in pertinent part:
 "We hereby agree with the drawers, endorsers and bona fide holders of drafts drawn under and in compliance with the terms of this credit that such drafts will be duly honored upon presentation to the drawee. The obligation of The First National Bank of Brundidge, *Page 215 
 under this Letter of Credit is the individual obligation of The First National Bank of Brundidge and is in no way contingent upon reimbursement with respect thereto.
 "Except as otherwise stated herein, this credit is subject to the Uniform Customs and Practice for Commercial Documentary Credits (1983 Revision) I.C.C. Publication No. 400. Notwithstanding Article 19 of said publication, if this credit expires during an interruption of business as described in Article 19, we agree to effect payment if the credit is drawn against within thirty (30) days after resumption of business."
(Emphasis added.)
In support of its argument, Nobel relies on this Court's discussion of the legal character of letters of credit in AmSouth Bank, N.A. v.Martin, 559 So.2d 1058 (Ala. 1990). In that case, this Court stated, in pertinent part:
 "Letters of credit are used to facilitate commercial transactions by providing the credit of a third party, usually a bank, as an independent guarantee of payment to protect the parties. The certainty of payment is the most important aspect of a letter of credit transaction, and this certainty encourages hesitant parties to enter into transactions, by providing them with a secure source of credit. Leon, Letters of Credit: A Primer, 45 Md.L.Rev. 432 (1986). In a basic transaction, a buyer and a seller enter into a contract for goods. In that agreement, the buyer promises to establish a letter of credit with a bank in the amount of the purchase price. Upon the buyer's application, the bank issues a letter of credit in favor of the seller, promising to pay the seller when he presents a draft and any documents specified in the letter. When the seller presents the appropriate documents, the bank pays the seller and seeks reimbursement from the buyer, who then takes the documents and retrieves the goods. In this context, the buyer is the `customer,' the seller is the `beneficiary,' and the bank is the `issuer.'
 "Letter of credit transactions are often governed by statute, and in Alabama a letter of credit is statutorily defined as an engagement by an issuing bank, made at a customer's request, that the issuer will honor drafts or other demands for payment upon compliance by the beneficiary of the credit with the terms specified in the letter of credit. Ala. Code 1975, § 7-5-103(1)(a). Thus, there are two distinct sets of obligations involved in a letter of credit transaction: the agreement between the issuer and the beneficiary is the letter of credit itself, and the agreement between the customer and the beneficiary that calls for the letter of credit is the underlying contract for goods and services. This Court has stated that the underlying contract between the customer and the beneficiary of the credit is independent of the rights and obligations created by the letter of credit. Citronelle Unit Operators Committee v. AmSouth Bank, N.A., 536 So.2d 1387 (Ala. 1988). The issuing bank has no obligation, nor is it permitted, to go behind the terms of the letter and the documents required to be presented, and to enter controversies between the beneficiary and the customer for whom the account was opened. Bank of the Southeast v. Jackson, 413 So.2d 1091 (Ala. 1982).
 "This is consistent with the rules set out in the Uniform Customs and Practice for Documentary Credits
(`UCP'), which were specifically adopted in the letter of credit in this case. Article 3 provides: *Page 216 
 "`Credits, by their nature, are separate transactions from the sales or other contract(s) on which they may be based and banks are in no way concerned with or bound by such contract(s), even if any reference whatsoever to such contract(s) is included in the credit.'
 "Art. 3, UCP, 1983 Revision, International Chamber of Commerce (`ICC') Pub. No. 400."
559 So.2d at 1062-63 (emphasis added).
Nobel asserts that the applicable law as stated in Martin requires that the contractual obligations contained in the letters of credit be enforced as complete and distinct transactions, without reference to the underlying loan arrangements to provide insurance coverage for Western American. Moreover, Nobel argues that the letters of credit at issue are "standby" letters of credit. This Court discussed standby letters of credit in Southern Energy Homes, Inc. v. AmSouth Bank, 709 So.2d 1180
(Ala. 1998):
 "A letter of credit is a financing engagement by an issuing bank, made at the request of an applicant (or customer), to honor demands for payment by the beneficiary of the credit, provided the terms and conditions of the letter of credit are met. Ala. Code 1975, § 7-5-103(1)(a). Ordinarily, letters of credit promote the sale of commodities by enabling a buyer of goods to obtain financing while at the same time securing payment for those goods in favor of the seller. Katherine A. Barski, Letters of Credit: A Comparison of Article 5 of the Uniform Commercial Code and the Uniform Customs and Practice for Documentary Credits, 41 Loy.L.Rev. 735, 737 n. 7 (1996). Standby letters of credit, in contrast to ordinary commercial credits, are used to guarantee the performance of an obligation. Id. The standby credit substitutes the financial strength of the issuing bank for that of the applicant. John Dolan, The Law of Letter of Credit: Commercial and Standby Credits ¶ 2.02 (rev. ed. 1996) (`Dolan'). The beneficiary of the standby credit reasonably expects to receive payment from the issuer promptly upon demand and before any litigation between the applicant and the beneficiary may occur. Dolan, at ¶ 3.06 3.07. While the applicant is performing, or preparing to perform, its obligation on the contract, the beneficiary, who awaits that performance, has the benefit of a separate promise
(from the issuer) that if the applicant defaults, the issuer will pay the beneficiary an amount of money secured by the letter of credit. Id. at ¶ 3.06. In order to obtain payment from the issuer, the beneficiary must notify the issuer, in the manner agreed upon, of its intent to draw upon the credit. Henry D. Gabriel, Standby Letters of Credit: Does the Risk Outweigh the Benefits?, 1988 Colum. Bus. L. Rev. 705, 708-09 (1988).
 "A letter-of-credit transaction typically includes three separate commitments: (1) the applicant's agreement with the bank, which obligates the bank to issue the letter and obligates the applicant to reimburse the bank; (2) the bank-beneficiary relationship, i.e., the letter of credit itself; and (3) the applicant-beneficiary relationship, i.e., the underlying contract. See AmSouth v. Martin, 559 So.2d at 1063; Citronelle Unit Operators Committee v. AmSouth Bank, N.A., 536 So.2d 1387 (Ala. 1988) (pointing out the two core obligations involved in a letter-of-credit transaction: the issuer-beneficiary, and the applicant-beneficiary agreement). The letter-of-credit transaction is essentially an independent contract between the issuer (AmSouth) and the beneficiary *Page 217 
 (Deutsche Bank/GBH). Id., 559 So.2d at 1063; Benetton Services, [Corp. v. Benedot, Inc., 551 So.2d 295, 298-99
(Ala. 1989)]; Citronelle Unit Operators Committee v. AmSouth Bank, N.A., supra. This case involves a four-way security arrangement, adding the bank guarantee transaction between GBH and Deutsche Bank. This four-way security arrangement is typical of many international standby letter-of-credit transactions. See, e.g., Foxboro Co. v. Arabian American Oil Co., 805 F.2d 34 (1st Cir. 1986). In these transactions, the issuer must honor the drafts or other demands for payment upon compliance with the terms of the letter of credit, which exist independently from the underlying transaction. Benetton Services, 551 So.2d at 298-99. Indeed, the UCP provides:
 "`a. Credits, by their nature, are separate transactions from the sales or other contract(s) on which they may be based and banks are in no way concerned with or bound by such contract(s), even if any reference whatsoever to such contract(s) is included in the Credit. Consequently, the undertaking of a bank to pay, accept and pay Draft(s) or negotiate and/or to fulfill any other obligation under the Credit, is not subject to claims or defenses by the Applicant resulting from his relationships with the Issuing Bank or the Beneficiary.
 "`b. A Beneficiary can in no case avail himself of the contractual relationships existing between the banks or between the Applicant and the Issuing Bank.'
 "Art. 3, UCP, 1993 Revision, International Chamber of Commerce (`ICC') Pub. No. 500.
 "Parties that enter into a credit arrangement do so to avail themselves of the benefits of that arrangement. Dolan, at ¶ 3.07. Shifting litigation costs is one of the functions of a standby credit. Id. In this situation, the parties negotiate their relationship while bearing in mind that litigation may occur. Id. This cost-shifting function gives one party the benefit of the money in hand pending the outcome of any litigation. Id. It is important to understand the functions of letters of credit in order to fully understand the consequences the fraud exception has on this commercial device. Id. A demand for payment made upon a standby credit usually indicates that something has gone wrong in the contract. Id. at ¶ 1.05[1]. Indeed, this is the nature of the standby letter of credit. Id. In contrast to the commercial credit, nonperformance that triggers payment in a standby credit situation usually indicates some form of financial weakness by the applicant. Id. For this reason, parties choose this security arrangement over another so that they may have the benefit of prompt payment before any litigation occurs. We recognize that, as a general rule, letters of credit cannot exist without independence from the underlying transaction. Id. at ¶ 2.09[5]. Thus, when courts begin `delving into the underlying contract, they are impeding the swift completion of the credit transaction.' Id. `The certainty of payment is the most important aspect of a letter of credit transaction, and this certainty encourages hesitant parties to enter into transactions, by providing them with a secure source of credit.' AmSouth v. Martin, 559 So.2d at 1062.
 "The extensive use of the fraud exception may operate to transform the credit transaction into a surety contract. Dolan, at ¶ 3.07. A standby credit is essentially equivalent to a loan made by the issuing bank to the applicant. Id. at ¶ 1.05[1]. Like a surety contract, the *Page 218 standby credit ensures against the applicant's nonperformance of an obligation. Id. Unlike a surety contract, however, the beneficiary of the standby credit may receive its money first, regardless of pending litigation with the applicant. Id. The applicant may then sue the beneficiary for breach of contract or breach of warranty, or may sue in tort, but without the money. Id. Parties to standby credit transactions have bargained for a distinct and less expensive kind of credit transaction. Id. at ¶ 1.05[1], ¶ 3.07[3]. . . ."
709 So.2d at 1184-86 (footnotes omitted) (emphasis added).
In light of the analysis in Southern Energy Homes, supra, we agree that the letters of credit issued by the Bank to Nobel are properly characterized as "standby" letters of credit. Because we also conclude that the letters of credit are properly viewed as distinct from the parties' surety arrangements, we must also conclude that the trial court erred in applying the law of suretyship to extinguish the Bank's responsibility to honor the letters of credit. The letters of credit are independent of the underlying transaction between Nobel and Western American. Martin, supra, and Southern Energy Homes, supra. Because we hold that the trial court erred in entering the summary judgment, we need not address the remaining issues presented by Nobel.
In case no. 1001351, we reverse the trial court's summary judgment in favor of the Bank, Ramage, Strother, Hamrick, and Palomar, and we remand the cause for further proceedings consistent with this opinion. In case no. 1001421, the Bank's and Ramage's appeal seeking to preserve claims that were dismissed by the entry of the summary judgment, we remand.
1001351 — REVERSED AND REMANDED.
1001421 — REMANDED.
Moore, C.J., and Brown, Woodall, and Stuart, JJ., concur.
See, J., recuses himself.